USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/12/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
UNITED STATES OF AMERICA,                                      :
                                                               :
                       -v-                                     :   16-CR-851 (VSB)
                                                               :
LARRY HARRIS,                                                  :   **OPINION & ORDER**
                                                               :
                       Defendant.                              :
                                                               :
-------------------------------------------------------------- X

VERNON S. BRODERICK, United States District Judge:

Before me is the motion of Larry Harris ("Defendant" or "Harris") pursuant to 18 U.S.C. § 3582(c)(1)(A) to "resentenc[e] him to time served and modify[] his conditions of supervised release to include a condition of home confinement for the period of time equal to the time he would have been released from confinement" because his asthma, and his inability to protect himself from COVID-19[1] while in prison are extraordinary and compelling reasons warranting the reduction of his sentence. (Harris Mot. 1.)[2] Because Harris has not sufficiently established extraordinary and compelling reasons warranting a reduction in his sentence and his release, his motion for compassionate release is DENIED.

I. **Background and Procedural History**[3]

Defendant was charged in the Complaint in connection with his participation in a scheme

---

[1] "COVID-19" refers to the coronavirus disease 2019. *See generally Coronavirus Disease 2019 (COVID-19), Frequently Asked Questions*, Centers for Disease Control and Prevention (updated Aug. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

[2] "Harris Mot." refers to the motion of Larry Harris to reduce his sentence filed on June 15, 2020. (Doc. 287.)

[3] The facts contained in this section are taken from the allegations in the complaint filed in this case on October 26, 2016, ("Complaint" or "Comp."). (Doc. 1.) These facts are merely provided for background, and I do not rely upon them in deciding Defendant's motion.

for which he and others were charged with participating in a conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, fraudulent use of credit cards, in violation of 15 U.S.C. § 1644(e), and aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Compl. ¶¶ 1-4.) Specifically, the Complaint charged Harris and others (the "Amtrak Ticket Thieves") with a scheme during which they "exchanged the debit and/or credit card numbers and personal identifying information of the Victims via email and other methods", "purchased tickets for Amtrak train travel via the phone-based Amtrak application, the internet, and at Amtrak ticket kiosks using the debit and/or credit card account numbers and personal identifying information of the Victims", and purchased other items, including "gift cards to chain and luxury retail stores." (Compl. ¶¶ 7-8.)

Defendant was arrested on November 2, 2016. According to the Government, "Harris was a central player in a sprawling credit card fraud scheme". At the time of his arrest in his home, law enforcement officers found "in excess of 200 gift cards, over 30 fraudulent credit cards, a ledger documenting in excess of $25,000 in gift card values, a fake driver's license, equipment used as part of the scheme (including a magnetic stripe scanner used to determine the value of gift cards), and a .22 caliber revolver." (Govt. Opp. 1.)[4]

Harris pleaded guilty on January 10, 2018, pursuant to a plea agreement, to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. The plea agreement calculated Defendant's Sentencing Guidelines range as 63 to 78 months' imprisonment; however, because the statutory maximum term of imprisonment under Section 371 was 60 months, Defendant's Sentencing Guidelines range was 60 months. After considering the factors contained in 18 U.S.C. § 3553(a),

---

[4] "Govt. Opp." refers to the Government's letter submitted in opposition to Defendant's motion for compassionate release dated June 22, 2020. (Doc. 290.)

I sentenced Harris to 38 months' imprisonment, three years of supervised release, and ordered him to pay approximately $200,412.70 in restitution to the victims of his offense. (*See generally* Doc. 227.) Harris is currently housed in the United States Penitentiary ("USP") Lewisburg, and his release date is March 31, 2021. *Find an Inmate*, Fed. Bureau of Prisons (last visited July 26, 2020), https://www.bop.gov/inmateloc/.

Defendant's motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), was filed on June 15, 2020, and included exhibits. The Government filed its opposition to Defendant's motion on June 22, 2020, (Govt. Opp.),[5] and Defendant filed his reply on June 25, 2020, (Reply).[6]

## II.  Discussion

Defendant seeks compassionate release "resentencing him to time served and modifying his conditions of supervised release to include a condition of home confinement for the period of time equal to the time he would have been released from confinement" because his asthma, and his inability to protect himself from COVID-19 while in prison are extraordinary and compelling reasons warranting the reduction of his sentence. (Harris Mot. 1.) In opposition, the Government argues that Harris has not met his burden of proof to establish extraordinary and compelling reasons warranting his immediate release because he has not demonstrated that his history of asthma earlier in his life "puts him at higher-risk for suffering complications from COVID-19 based on current CDC guidance." (Govt. Opp. 3.) The Government also argues that a consideration of the Section 3553(a) factors militate against Defendant's release. (*Id*. 3-4.) I agree with the Government and find that Defendant has not met his burden to establish that

---

[5] "Govt. Opp." refers to the Government's letter in opposition to Defendant's compassionate release motion dated June 22, 2020. (Doc. 290.)

[6] "Reply" refers to Defendant's letter in reply to the Government's opposition dated June 25, 2020. (Doc. 291.)

extraordinary and compelling reasons exist, and the Section 3553(a) factors counsel against the reduction of Defendant's sentence and his early release.

### A. *Applicable Law*

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020). Section 3582(c)(1)(A)(i), the compassionate release statute, provides one such exception. The compassionate release statute permits a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[7] 18 U.S.C. § 3582(c)(1)(A).

Until recently, a court could not order compassionate release unless the BOP requested such relief on a prisoner's behalf. *See* U.S.S.G. § 1B1.13; *see also Gotti*, 433 F. Supp. 3d at 614. However, in December 2018, Congress passed the First Step Act, which did away with BOP's unilateral ability to deny a prisoner compassionate release but did not remove the BOP from the process entirely. *See id.* The statute is clear that a court may only grant compassionate release

---

[7] The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13, although I note that the Sentencing Guidelines have not yet been revised to take into account the First Step Act. *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, *2 (S.D.N.Y. Apr. 3, 2020). The relevant section provides that a court may reduce the term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction," *id*. § 1B1.13(1)(A); (2) "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id*. § 1B1.13(2); and (3) "the reduction is consistent with this policy statement," *id*. § 1B1.13(3). The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist." *Id*. § 1B1.13 Application Note 1. Further, Defendant, as proponent of the motion, bears the burden of proving that extraordinary and compelling reasons exist. *United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.")); *see also United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) ("[I]f the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease." (quoting *Butler*, 970 F.2d at 1026)); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

"upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

Requiring inmates to exhaust their administrative remedies before seeking court intervention serves several purposes.  First, it protects administrative agency authority by guaranteeing agencies the "opportunity to correct [their] own mistakes," *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  Second, it promotes efficiency, since claims "generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court."  *Id*.

"The provenance of an administrative exhaustion requirement determines its scope." *United States v. Monzon*, No. 99cr157 (DLC), 2020 WL 550220, at *1 (S.D.N.Y. Feb. 4, 2020). There are two types of exhaustion requirements:  jurisdictional ones and non-jurisdictional ones. Jurisdictional exhaustion requirements "govern a court's adjudicatory authority" and are not subject to any exceptions.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (internal quotation marks omitted).  Non-jurisdictional requirements, also referred to as "claim-processing rules," can be "forfeited if the party asserting the rule waits too long to raise the point."  *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004).  The Second Circuit has not yet squarely answered the question of whether the exhaustion requirement of § 3582(c) is jurisdictional.[8]  *Monzon*, 2020 WL

---

[8] Other courts of appeal are split on the question of whether section 3582(c) as a whole is jurisdictional or non-jurisdictional.  *Compare United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013) (considering section 3582(c) a jurisdictional rule); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *United States v. Williams*, 607 F.3d 1123, 1125–26 (6th Cir. 2010); *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *and United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *with United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017)

550220, at *2. !

        **B.**    *Application*

           **1. Exhaustion**

Here, Defendant claims that he "wrote to the warden of Lewisburg[9] requesting compassionate release, noting his underlying medical condition of asthma" in a document dated April 18, 2020. (Harris Mot., Ex. A). Defendant, however, does not use the term "compassionate release" in his purported communication with the warden; instead he states that he would "like to know if [he] can be considered for or if [he is] eligible to receive home confinement due to the recent outbreak of Covid-19 cases." (*Id.*) Defendant then states that "[h]aving asthma is a major concern of [his] and a huge respiratory issue as [he is] sure that you know can be fatal when mixed with the virus." (*Id.*) He then says that the warden rejected his request on May 11, 2020.[10] Defendant has not attached the rejection from the warden. However, the Government does not challenge Defendant's motion on the basis that he has failed to exhaust his administrative remedies. Therefore, the Government has waived their objection to challenge the motion based on Defendant's failure to exhaust his administrative remedies, and I address the substance of Defendant's motion.

---

(considering section 3582(c) a claim-processing rule); *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245 (11th Cir. 2017); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015); *and United States v. Weatherspoon*, 696 F.3d 416, 421 (3d Cir. 2012). And while the Second Circuit has not weighed in on whether the exhaustion requirement of section 3582(c)(1)(A) is jurisdictional, it has, "in a related context . . . firmly disagreed with the characterization by certain other circuits that § 3582(c)(2) is jurisdictional." *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020) (citing *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013)).

[9] Defendant sent this document to "Unit K" and to "Mr. Youngman" but argues—without explaining the connection between the document, Youngman and the warden—in his papers that this communication was sent to the warden.

[10] Harris on one page of his motion cites the date of the rejection as May 11, 2002, (Harris Mot. 4), and on another page cites the date as May 11, 2020, (Harris Mot. 1). The date of May 11, 2002 is clearly a typographical error so I assume the date should read May 11, 2020.

## 2. Extraordinary and Compelling Circumstances

For the reasons that follow, on the current record I do not find that Defendant has met his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his early release.

"Asthma is a disease that affects your lungs.  It causes repeated episodes of wheezing, breathlessness, chest tightness, and nighttime or early morning coughing." *Asthma*, Centers for Disease Control and Prevention (last visited Aug. 5, 2020), https://www.cdc.gov/asthma. "Asthma severity is determined by current impairment (as evidenced by impact on day-to-day activities) and risk of future exacerbations (as evidenced by frequency of oral systemic corticosteroid use), and allows categorization of disease as intermittent, persistent-mild, persistent-moderate, and persistent-severe.  Initial treatment is guided by the disease-severity category." *Overview of Changes to Asthma Guidelines: Diagnosis and Screening*, American Family Physician (last visited Aug. 5, 2020) https://www.aafp.org/afp/2009/0501/p761.html. Persistent-moderate asthma manifests itself in daily symptoms, daily use of short-acting beta agonist[11] use for symptom control, and some limitation on normal daily activity.  (*Id.*, Table 1) Persistent-severe asthma manifests itself in symptoms throughout the day and night, short-acting beta agonist use for symptom control several times a day, and extreme limitation on daily activities.  (*Id.*)

Moderate-to-severe asthma has been identified by the Centers for Disease Control and Prevention ("CDC") as an illness that may place individuals at increased risk of serious illness or death from COVID-19. *See People of Any Age with Underlying Medical Conditions*, Centers for

---

[11] A beta agonist is "[a] bronchodilator medicine that opens the airways by relaxing the muscles around the airways that may tighten during an asthma attack or in COPD (chronic obstructive pulmonary disease).  Beta-agonists can be administered by inhalers or orally." *Definition of Beta-Agonist*, RxList (last visited Aug. 5, 2020), https://www.rxlist.com/script/main/art.asp?articlekey=24664.

Disease Control and Prevention (last updated July 30, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Although, there is little empirical data to support that individuals with moderate-to-severe asthma are in fact at increased risk if they contract COVID-19, *see Asthma is Absent Among Top Covid-19 Risk Factors, Early Data Shows*, New York Times (Apr. 16, 2020), *available at* https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html, I accept the CDC's current view that moderate-to-severe asthma may place individuals at increased risk of serious illness or death from COVID-19.

      At the time Defendant was interviewed by the Probation Department he essentially denied that his asthma was a persistent health issue, and he stated he did not even use an inhaler. (PSR ¶ 94 ("He suffers from asthma; however, Harris stated that he does not use an inhaler or medication, and he said that he only experiences symptoms when he has a cold.").)[12]  He also did not mention that he had or has asthma in his sentencing submissions or during sentencing. (Docs. 206, 225.)  Nor does he claim in his compassionate release motion papers that he has suffered asthma attacks or been treated for asthma during his incarceration.  Finally, the description provided by Defendant's mother of his asthma in her declaration is inconsistent with Defendant's comments to Probation, and is not supported by his sentencing submission, sentencing transcript, or by asthma attacks since he has been in prison.  In any event, even if I accept her description of her son's condition, at most that description would support a finding that Harris suffered from asthma as an infant and child, and only rarely suffered from asthma attacks as an adult. (Harris Mot. Ex. B ¶ 9 ("As a child Larry asthma attacks were often, at least twice a month if not more and severe enough that he was taken to the emergency room."), ¶ 11

---

[12] "PSR" refers to the Presentence Investigation Report filed on April 9, 2020.  (Doc. 191.)

("In Middle School, the nurse would keep a nebulizer and an inhaler in her office to enable Larry to obtain immediate treatment in school."), ¶ 12 ("Generally, as he got into his late teens and to this day, when he experiences a mild asthma attack or when he feels an attack coming on, he is able to minimize the attack through breathing and relaxation exercises that he was taught by his doctor and the school nurse.  When he was home, he also used a nebulizer and inhaler pumps."), ¶ 13 ("Nonetheless, even up to the time he was a young adult, there were times he went to the emergency room when he was experiencing a severe asthma attack."), ¶ 14 ("As a result of his asthma, Larry was barred from participating in sports and physical activities that were strenuous because these activities would bring on asthma attack."), ¶ 15 ("As an adult, Larry's asthma attacks result from his exposure to dust mites, when he engages in physical activity, and when his is overly anxious.  But he still experiences severe attacks when he has any upper respiratory illness even from when he has a simple cold.").  This description does not support a finding that even as a child Defendant suffered from moderate to severe asthma.  In short, to the extent that the evidence presented supports that Harris currently suffers from asthma—a fact which is debatable—it certainly does not support that Harris suffers from moderate to severe asthma.

### 3.  Section 3553(a)

Granting Harris's compassionate release motion would require reducing his sentence to time served which would result in a substantial reduction in his sentence.  According to Harris's plea agreement, he faced the initial guideline calculation called for a sentence of between 63 to 78 months' imprisonment.  However, because the statutory maximum of the statute of conviction was lower, Defendant's Guidelines Range became 60 months.  After considering the factors under 18 U.S.C. § 3553(a), I sentenced Harris to 38 months' imprisonment—a substantial variance from Defendant's Guideline Range.  Harris is scheduled to be released on March 31,

2021; therefore, there are approximately 8 months remaining on his sentence.  I do not find that the circumstances have changed, including due the current health crises due to COVID-19, so dramatically as to warrant a sentence of time served.

   Defendant was not a minor participant in the Amtrak and debit/credit card scheme.  In fact, at the time of his arrest in his home, law enforcement officers found "in excess of 200 gift cards, over 30 fraudulent credit cards, a ledger documenting in excess of $25,000 in gift card values, a fake driver's license, equipment used as part of the scheme (including a magnetic stripe scanner used to determine the value of gift cards), and a .22 caliber revolver."  (Govt. Opp. 1.)  Defendant points out that he has taken steps he claims evidence his rehabilitation, including working while incarcerated, not committing or being charged with disciplinary infractions, and reading an "impressive number of books."  (Reply 6, Doc 288-3 Ex. C.)  Although Defendant's actions are admirable, when viewed in light of his criminal conduct, I find that they are insufficient to warrant a reduction in his sentence.  I also note that Defendant has not addressed the overwhelming evidence seized at the time of his arrest that demonstrated how deeply he was involved in the Amtrak and debit/credit card scheme.  In addition, while Defendant states that he has not been convicted of a crime of violence "and [] has no history of violence," (Reply 6)—besides uncorroborated, self-serving assertions about why he had a gun and speculation about whether it was operable—he cannot deny the simple fact that despite the nature of his crime he possessed a firearm at the time of his arrest.  I reject Defendant's assertion that his possession of a firearm "has no bearing on [my] assessment of whether he possess [sic] a danger to his community."  (*Id*.)  Defendant was not charged with illegally possessing a firearm because such possession was not in the Southern District of New York.  (*See* Govt. Opp. 3.)  Yet, I reject Defendant's assertion that his possession of a firearm has no bearing on whether he might pose a

danger.  To be clear, I am not making a legal determination that Defendant's possession of a firearm means he is a danger to the community as a legal matter.  Rather, in considering Defendant individually, as I must, I find that Defendant's possession of a firearm is troubling and raises concerns that would not exist but for such possession.

### III. Conclusion

For the reasons stated above, because I find that on the current record that Defendant has not sufficiently established extraordinary and compelling circumstances justifying the reduction in his sentence and his release from custody, Defendant's motion for compassionate release is DENIED.

The Clerk's Office is directed to terminate the gavels at docket entry 287 and 291.

SO ORDERED.

Dated:   August 12, 2020
         New York, New York

*Vernon Broderick*
Vernon S. Broderick
United States District Judge

11